UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CARI ALTAYEB,                        :
                                     :
       Plaintiff,                    :
                                     :
v.                                   :   CASE NO. 3:09CV1788 (RNC)
                                     :
MARIA BRERETON, et al.,              :
                                     :
       Defendants.                   :

RULING AND ORDER

Plaintiff Cari Altayeb brings this action under 42 U.S.C. §
1983 against Maria Brereton, an Official of the Connecticut
Department of Children and Families ("DCF"), and Martin
Pizighelli and James Viadero, both Bridgeport police officers,
claiming principally that Brereton violated her right to family
integrity under the Due Process Clause of the Fourteenth
Amendment, and that Pizighelli and Viadero violated her right to
be free from false arrest, malicious prosecution and excessive
bail under the Fourth and Eighth Amendments.  The defendants have
moved for summary judgment [Docs. 42 and 43].  For reasons that
follow, the motions are granted.

I.   Summary Judgment

Summary judgment may be granted when there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S.
317, 322 (1986).  To avoid summary judgment, the plaintiff must
point to evidence that would permit a jury to return a verdict in
her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252

(1986).  In determining whether this standard is met, the evidence in the record must be viewed in the light most favorable to her.  Id. at 255.

II.  Background

The parties' Local Rule 56 statements and the admissible evidence in the record, viewed fully and most favorably to the plaintiff, establish the following facts for purposes of this ruling.[1]  In August 2006, plaintiff was physically assaulted by her husband.  At the time, plaintiff lived with her husband and their four young children in Fairfield.  Plaintiff's husband was incarcerated as a result of the assault and a protective order was issued prohibiting him from contacting the plaintiff or their children.  Plaintiff's husband is of Jordanian origin.

Soon after the assault, DCF became involved with the family. On November 1, 2006, DCF exercised a 96-hour hold and removed the children from the plaintiff's home for safety reasons.  The next day, the Connecticut Superior Court for Juvenile Matters issued an order permitting DCF to take temporary care and custody of the children.

On November 7, 2006, plaintiff's husband approached a DCF social worker outside the Bridgeport DCF office in an angry and

---

[1]  To the extent the facts recited in the text are unfavorable to the plaintiff's claims, those facts have either been explicitly admitted by the plaintiff or are not the subject of a genuine dispute.

2

hostile manner.  He was distraught about DCF taking his children out of the home.  The social worker reported the incident to her supervisor.  As a result of the incident, the court prohibited the plaintiff's husband from contacting DCF, entering a DCF facility, or approaching a DCF worker.

On December 6, 2006, the court adjudicated the plaintiff's children as neglected.  On December 13, 2006, the court determined that the children would not be in a safe environment in their home and committed them to DCF until further order. Plaintiff was ordered by the court to "have no involvement with the criminal justice system" and to "visit the children as often as DCF permits."  Beginning November 1, 2006, DCF permitted visitation once a week.

On December 6, 2006, plaintiff attended a weekly visitation with her children at the Bridgeport DCF office.  At the end of the visitation, plaintiff accompanied the children to a vehicle that DCF used to transport the children to a safe home.  The DCF social worker who drove the vehicle reported that a dark SUV followed her as she drove the children but that she was able to lose the SUV before reaching the safe home.  As a result of this incident, Bridgeport DCF officials arranged to have a Bridgeport police officer standby in an unmarked vehicle on the days plaintiff visited her children.

On January 3, 2007, during plaintiff's visitation with her

children at the Bridgeport DCF office, a DCF employee reported seeing plaintiff's husband drive by the building in a vehicle with his sister and another male. The DCF employee was instructed by her supervisor to call the police. Another anonymous witness called the police and reported that the occupants of the vehicle were throwing a white powder from the vehicle while driving down the street.

The next day, January 4, Officer Pizighelli was assigned to a detail near the garage entrance of the Bridgeport DCF building. The Bridgeport Police Department had created a special overtime assignment for that location because of reports of the previous incidents relating to plaintiff's husband. Pizighelli understood that he was stationed there to watch for potential threats by plaintiff's husband. In connection with his assignment, he had seen photographs of both the plaintiff and her husband.

While Pizighelli was outside the garage entrance to the DCF building, a vehicle driven by the plaintiff passed the location at a slow rate of speed. Plaintiff was accompanied by her sister-in-law, Annam.[2] Pizighelli immediately recognized the plaintiff as the wife of the man who had been making threats against DCF. As the vehicle passed the DCF building, Pizighelli

---

[2] The correct spelling of plaintiff's sister-in-law's name is unclear from the record. The spellings in the record include Anaan, Annam, Anaam and Enam. The Court adopts the spelling "Annam," which is how the plaintiff spelled her sister-in-law's name at her deposition.

saw the plaintiff point to the entrance of the garage.
Plaintiff stopped at a stop sign near the DCF building and Anaam
got out of the vehicle.  Plaintiff knew that sometime in the
past, her husband and Annam had prayed near the DCF building for
the swift return of the children.  After dropping off Annam,
plaintiff drove around the block.

Pizighelli saw Annam take a white powdery substance out of
her clothing and sprinkle it on the ground near the entrance of
the DCF garage and then on the side of the building.  Pizighelli
was aware that law enforcement officials across the country were
concerned about attacks or threatened attacks with white powdery
substances similar in appearance to anthrax.  In response to this
concern, the Bridgeport Police Department had adopted a detailed
policy for responding to incidents involving suspected hazardous
materials.

After seeing Annam sprinkle the white substance in the area
of the DCF building, Pizighelli radioed dispatch as to what he
had seen and requested backup in accordance with the hazardous
materials policy.  By this time, the plaintiff had driven around
the block and returned to get Annam.  Pizighelli stopped the
plaintiff's vehicle, asked her to step out, and asked if she knew
the person sprinkling the white substance.  Plaintiff said she
did.  Pizighelli asked the plaintiff to sit in a police car.
This brief interaction was Pizighelli's only involvement with the

plaintiff.

Other Bridgeport police officers and members of the fire department responded to the scene in accordance with the policy applicable to an incident involving suspected hazardous materials. Annam subsequently ingested the white substance at the scene in order to demonstrate that the substance was salt. While plaintiff was sitting in the police car, Lieutenant Viadero told her he knew who her husband was and that this was "his case." Plaintiff interpreted Viadoro's statement to mean that he was in charge of the investigation then underway. Viadoro has submitted an affidavit attesting that he was assigned to coordinate with others in responding to and investigating the presence of suspected hazardous materials and that he had no involvement in deciding whether plaintiff would be criminally charged.

After sitting alone in the police car for a period of time, plaintiff was informed that she was being arrested for disorderly conduct. Plaintiff admits that Pizighelli was not involved in the arrest. She asserts that Viadoro was personally involved in the arrest but the evidence she points to is insufficient to support such a finding.[3]

---

[3] Following the plaintiff's arrest, Viadero spoke to a reporter. He told the reporter that the white substance was "white powder, possibly salt" and stated that the women, referring to the plaintiff and Annam, "were acting suspiciously." He subsequently contacted the U.S. Attorney's office about

Plaintiff and her sister-in-law were taken to the police station.  A detective questioned them there.  Plaintiff told the detective that the white substance Annam had sprinkled on the ground was probably salt.  Plaintiff was asked numerous questions about her husband.  Later that night, plaintiff was taken to Troop G, where she spent the night.

The next morning, January 5, 2007, plaintiff was charged with threatening in the first degree in violation of Conn. Gen. Stat. § 53a-61aa,[4] breach of peace in the first degree in violation of § 53a-180aa,[5] and terrorism in violation of § 53a-300.[6]  Bail was set at $1,000,000.  The booking process took

---

federal charges that could be filed against the plaintiff but no federal charges were brought.  These pieces of evidence, viewed collectively in the light of the entire record, do not support a reasonable inference that Viadoro was personally involved in the plaintiff's arrest.

[4]  This statute applies to threats to commit a crime involving use of a hazardous substance with intent to cause evacuation of a building or serious public inconvenience, or in reckless disregard of the risk of causing such an evacuation or inconvenience.  See Conn. Gen. Stat. § 53a-61aa(a).

[5]  This statute provides: "A person is guilty of breach of peace in the first degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person places a nonfunctional imitation of an explosive or incendiary device or an imitation of a hazardous substance in a public place or in a place or manner likely to be discovered by another person."  Conn. Gen. Stat. § 53a-180aa.

[6]  This statute provides: "A person is guilty of an act of terrorism when such person, with intent to intimidate or coerce the civilian population or a unit of government, commits a felony involving the unlawful use or threatened use of physical force or violence."  Conn. Gen. Stat. § 53a-300(a).

place at about 5:00 a.m.  Later that morning, plaintiff was
taken to court.  By the time of her court appearance, the
authorities were satisfied that the white substance was salt.
The court found no probable cause for the terrorism charge, which
was dismissed, and plaintiff's bail was reduced to $25,000.
Plaintiff was then released from custody.  On January 27, 2007,
the remaining charges for threatening and breach of peace were
nolled.

At the time of these events, defendant Brereton was the
manager of staff operations at the Bridgeport DCF Office.  Her
responsibilities included providing a safe environment for DCF
staff and clients.  The day after plaintiff's arrest, Brereton
sent her a certified letter stating that DCF was concerned about
the events underlying the arrest and that, effective immediately,
she was banned from entering DCF offices without prior written
permission.  Plaintiff did not receive this letter.

The day Brereton sent the letter, she learned that a judge
had found no probable cause for the terrorism charge.  That same
day, she also learned that Annam had ingested the white substance
to show police that the substance wasn't dangerous.  Brereton's
notes indicate that the substance presumptively tested as salt,
the police believed it was salt, and a 48 hour test on the
substance would be completed that weekend.

On Monday, January 8, 2007, the next business day after

Brereton sent the certified letter to the plaintiff, Assistant
Attorney General Kim Mathias filed an emergency motion in the
Superior Court for an order suspending visitation between the
plaintiff and her children.  On January 10, while the motion was
pending, plaintiff appeared at the Bridgeport DCF Office for her
weekly visitation and was escorted out of the building.  As she
had not received the letter sent by Brereton, she did not know
that she was banned from entering the building.

On January 11, 2007, plaintiff's counsel in the juvenile
court proceeding filed a motion for contempt against DCF for
denying plaintiff the right to visit her children the previous
day.  That same day, AAG Mathias contacted plaintiff's counsel
and informed him that a meeting was being scheduled to discuss
safety issues related to visitation.  On January 17, a meeting
was held and a safety plan was developed.  The state's emergency
motion was still pending.  The plan provided that visitation
between plaintiff and her children was to occur at non-DCF
locations with only two children at a time, due to a risk of
flight.  Plaintiff was notified that visitation would resume
pursuant to the safety plan on January 18, at which time
plaintiff visited with two of her children.

On January 25, 2007 the emergency motion to suspend
visitation, which had yet to be addressed by the court, was
marked off because visitation had recommenced at non-DCF sites.

That same day, the court denied the plaintiff's motion for
contempt stating that DCF had been required to take steps to
ensure safety.  The next visitation between the plaintiff and two
of her children occurred on January 26.  Plaintiff resumed
visitation with all her children on February 1 and 2, 2007.

III.  Discussion

A.  Defendant Brereton

    1.  Right to family integrity

    Plaintiff seeks to recover money damages against Brereton
for violating her right to family integrity.  Brereton moves for
summary judgment as to this claim on the ground that she is
entitled to qualified immunity.  The doctrine of qualified
immunity "protects state officials from civil liability for
actions performed in the course of their duties if their conduct
does not violate clearly established statutory or constitutional
rights of which a reasonable person would have known."  Luna v.
Pico, 356 F.3d 481, 490 (2d Cir. 2004) (internal quotations
omitted).  "A right is clearly established if (1) the law is
defined with reasonable clarity, (2) the Supreme Court or the
Second Circuit has recognized the right, and (3) a reasonable
defendant [would] have understood from the existing law that
[his] conduct was unlawful."  Anderson v. Recore, 317 F.3d 194,
197 (2d Cir. 2003) (internal quotations and citations omitted).

    The integrity of the family unit is protected by the Due

Process Clause of the Fourteenth Amendment.  See Southerland v. City of New York, 680 F.3d 127, 152 (2d Cir. 2012)("We have long recognized that parents have a constitutionally protected liberty interest in the care, custody and management of their children, and that the deprivation of this interest is actionable on a substantive due process theory." (Citations and internal quotation marks omitted)).  Case law discussing this right usually involves a custodial parent's interest in retaining custody of a child.  In the present case, plaintiff's children had been placed in DCF's custody under court orders that permitted DCF to exercise discretion with regard to visitation. Plaintiff points to no Supreme Court or Second Circuit case, and none has been found, discussing the contours of a non-custodial parent's constitutional right to visit a child who has been removed from the parent's home and placed in the custody of a child protection agency.

Brereton's conduct toward the plaintiff after January 4, 2007, was not objectively unreasonable.  She had a duty to take steps to ensure the safety of DCF staff and clients, as the Superior Court found in denying plaintiff's motion for contempt. Though the terrorism charge against the plaintiff was dismissed on January 5, the charges against her for threatening in the first degree and breach of peace in the first degree remained pending.  In the context of the events of January 4 involving the

11

plaintiff and her sister-in-law, and the prior incidents involving plaintiff's husband, and in light of the court order banning him from DCF facilities as a result of his threatening conduct, a reasonable official in Brereton's position could believe that temporarily banning the plaintiff from entering DCF facilities without prior permission would not violate her right to family integrity under the Due Process Clause.

Even assuming a reasonable official in Brereton's position would have understood that plaintiff's visits with her children could not be suspended without a court order, her conduct did not violate a clearly established right.  The state filed the emergency motion seeking just such an order the first business day after Brereton sent her certified letter to the plaintiff notifying her that she would not be allowed to enter DCF facilities without prior permission.  Cf. E.D. v. Tuffarelli, 692 F. Supp.2d 347, 368 (E.D.N.Y. 2010)(no substantive due process violation when children were removed from family home on Friday evening and judicial proceedings commenced the following Monday).  Though the ban remained in effect until the safety plan was developed, the suspension of the visits during the interim while the emergency motion remained pending is not fairly attributable to Brereton.  See Southerland v. City of New York, 680 F.3d 127, 154-55 (2d Cir. 2012).

On this record, then, Brereton is entitled to qualified

immunity as a matter of law.

    2.  Equal protection

    Plaintiff argues that Brereton perceived her to be a violent person because of her husband's Jordanian origin and as a result treated her in a manner that violated her Fourteenth Amendment right to equal protection.  To prevail on an equal protection claim, plaintiff must provide evidence of selective enforcement or a substantial departure from normal practice.  <u>See</u> <u>Brady v. Town of Colchester</u>, 863 F.2d 205, 216-17 (2d Cir. 1988).  In support of her claim, plaintiff cites only her own perception that Brereton unlawfully discriminated.  Plaintiff's belief, no matter how sincerely held, does not constitute evidence that Brereton acted unlawfully.  Moreover, the Court's own review of the record discloses no evidence to support a finding of either selective enforcement or a departure from normal practice on the part of Brereton.  Crediting plaintiff's testimony that her sister-in-law sprinkled the salt at the DCF building as part of a prayer ritual, conducting such a ritual without prior notice to DCF created a foreseeable risk of causing alarm and serious inconvenience, as in fact it did, warranting a significant response by Brereton.  There is no indication that Brereton would have responded differently if plaintiff's husband were of a different national origin.

    3.  Intentional infliction of emotional distress

Plaintiff also sues Brereton under state law for intentional infliction of emotional distress.  This claim requires plaintiff to prove that (1) Brereton intended to inflict emotional distress or should have known emotional distress was likely, (2) Brereton's conduct was extreme and outrageous, (3) the conduct caused plaintiff to suffer emotional distress, and (4) plaintiff's emotional distress was severe.  Carrol v. Allstate Ins. Co., 262 Conn. 433, 443 (Conn. 2003).  Conduct is "extreme and outrageous" for purposes of this tort only if it exceeds all bounds of decency and is regarded as atrocious, and utterly intolerable in a civilized community.  Appleton v. Bd. of Educ., 254 Conn. 205, 210 (Conn. 2000).  Brereton moves for summary judgment on this claim contending that her conduct was not "extreme and outrageous" as a matter of law.  I agree.  Even assuming a reasonable person could agree with plaintiff's position that Brereton overreacted, no reasonable person could find that Brereton's conduct exceeded all bounds of decency.

B.  Defendants Pizighelli and Viadero

1.  False arrest, malicious prosecution, excessive bail

Plaintiff claims that Pizighelli and Viadoro deprived her of her right to be free from false arrest, malicious prosecution and excessive bail in violation of the Fourth and Eighth Amendments. These defendants move for summary judgment principally on the ground that they were not personally involved in the plaintiff's

14

arrest, the selection of the criminal charges against her, the booking process or the process relating to bail.  "It is well settled in [the Second] Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotations omitted).

The evidence in the record does not support a reasonable finding that either Officer Pizighelli or Lieutenant Viadoro was involved in plaintiff's arrest.  Plaintiff admits that Pizighelli was not involved in the arrest.  She assumes Viadoro was involved because he told her in the police car that it was "his case." However, she admits that she has no evidence proving that he was personally involved in the arrest.  In the absence of such evidence, the false arrest claim does not raise a genuine issue for trial.[7]

Plaintiff's malicious prosecution and excessive bail claims also fail for lack of sufficient evidence to support a finding of

---

[7]  Plaintiff's opposition papers seem to suggest that Pizighelli's brief interaction with her on January 4 makes him liable for an unreasonable seizure.  Assuming she is still attempting to make such a claim, the claim is unavailing.  An investigative detention is lawful if it is based on reasonable suspicion that criminal activity may be afoot.  See United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995).  The circumstances surrounding the January 4 incident provided Pizighelli with reasonable suspicion that plaintiff and her companion were engaged in criminal activity involving threatening conduct toward DCF.

personal involvement.  Crediting plaintiff's deposition testimony, she was not charged until about 5:00 a.m. on January 5, at which time bail was set at $1 million.  There is no indication that Pizighelli or Viadoro was involved in the charging decision or the bail decision.

    2.  Substantive due process

In addition to her Fourth and Eighth Amendment claims, plaintiff appears to be claiming that Pizighelli and Viadoro violated her right to substantive due process.  To prevail on this claim against either defendant, plaintiff must prove that the defendant engaged in conscience-shocking conduct.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998); Robischung-Walsh v. Nassau Cnty. Police Dep't, 421 F. App'x 38, 41 (2d Cir. 2011).  Plaintiff does not state which of the defendants' actions violated her right to substantive due process.  After independent review of the record, the Court sees no basis on which a jury could reasonably find that either defendant engaged in such conduct.[8]

    3.  Equal protection

Plaintiff claims that Viadoro deprived her of her right to

---

    [8]  Plaintiff's complaint asserts that the police violated her right to family association but plaintiff testified at her deposition that the family association claim is against DCF and that she is not claiming that the actions of the police prevented her from seeing her children.  Accordingly, any such claim against the police is deemed abandoned.

equal protection.  This claim focuses on Viadero's comment to the plaintiff while she was sitting in the police car that he knew her husband.  Crediting plaintiff's testimony that Viadero made such a comment, it does not follow that he knew her husband's Middle Eastern origin.  Even assuming a jury could draw that inference, there is no evidence that Viadero treated plaintiff in a discriminatory manner because of her husband's nationality as required to support an equal protection claim.

4.  Intentional infliction of emotional distress

Plaintiff also seeks to recover against Pizighelli and Viadero for intentional infliction of emotional distress.  They move for summary judgment on the ground that no reasonable juror could find that their conduct was "extreme and outrageous," the strict standard required for liability.  I agree.  Plaintiff identifies no act or omission by Pizighelli or Viadoro that could be regarded as exceeding all possible bounds of decency.

IV. Conclusion

Accordingly, defendants' motions for summary judgment [Docs. 42 and 43] are hereby granted.  The Clerk may close the file.

So ordered this 2nd day of October 2013.


                              /s/ RNC
                         Robert N. Chatigny
                         United States District Judge


17